UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FREDERICK PACHALY,                    :

         Plaintiff,                   :

V.                                    :      Case No. 3:11cv156 (RNC)

BENEFITS ADMINISTRATION               :
COMMITTEE UNILEVER UNITED             :
STATES INC. et al.,                   :

         Defendants.                  :

RULING AND ORDER

The plaintiff, Frederick Pachaly, brings this action

against the defendants, the Unicare Benefits of Choice

Program ("the Plan") and Benefits Administration Committee

Unilever United States Inc. ("Unilever"), under the Medicare

Secondary Payer Statute ("MSP"), 42 U.S.C. § 1395y, and the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

§ 1132.  He seeks to enjoin Unilever from discontinuing his

benefits under the Plan.  Pending is the defendants' motion

pursuant to Federal Rule of Civil Procedure 12(b)(6) to

dismiss the complaint for failure to state a claim on which

relief may be granted (Doc. 33).  With regard to the MSP

claim, the defendants' argue principally that the private

right of action authorized by the statute is limited to

claims for damages and cannot be invoked unless a primary

1

insurer has improperly denied a claim resulting in payment of the claim by Medicare, which has not occurred here.  I agree with the defendants' argument that the MSP does not authorize the plaintiff's claim for injunctive relief and find it unnecessary to rule on the defendants' other arguments regarding the MSP claim, which are less clear-cut. With regard to the ERISA claim, the defendants' main argument is that the plaintiff has not pleaded the essential elements of a claim of promissory estoppel. I agree with this argument as well.  Accordingly, the defendants' motion to dismiss is granted.

I.  Background

The plaintiff began working for Elizabeth Arden, a wholly owned subsidiary of Unilever, in 1993.  In 1996, he became ill and began receiving long term disability ("LTD") benefits under Unilever's Plan.  Pursuant to the terms of the Plan,[1] he was entitled to receive health, dental and life insurance benefits as long as he was eligible for LTD coverage and paid the required premiums.[2]  The Plan also

---

[1] As the Summary Plan Description ("SPD") and the Plan are included in the same document, they are collectively referred to as "the Plan."

[2] The Plan provides that "other benefits in which [employees] have enrolled (such as medical, dental, life,

provided that Unilever, as Plan administrator, could alter

or terminate benefits under the Plan at any time.

Specifically, the Plan's introductory section provides that:

> [Unilever] expects to continue the Plans, but
> reserves the right to change or end them at any
> time . . . . [Unilever's] rights to make such
> changes include, but are not limited to, the right
> to discontinue at any time all benefits under any
> or all of the Plans.  Compl., Ex. A (Doc. 1-1) at
> 5.

Similarly, the Administrative Section of the Plan provides

that:

> [Unilever] reserves the right to end or amend, in
> any manner not prohibited by law, UNICare Plans at
> any time with respect to any active, retired or
> former employees.  In the event of termination of
> the Retirement Plan, you will become 100% vested
> in your accrued benefit.  If any other employee
> benefit plan is terminated, you will not be vested
> in any benefits or have any further rights other

---

AD&D) . . . may continue during [their] disability period,
provided [they] make the required contributions."  Compl.,
Ex. A (Doc. 1-1) at 69. An individual is eligible for LTD
benefits under the Plan "after being totally disabled for 6
consecutive months." The Plan defines total disability as
being "prevented from doing any job for which [employees]
are reasonably qualified by training, education, or
experience" due to "illness, an accidental injury, or
disability."  Although employees "need not be confined in a
hospital or at home to receive LTD plan benefits, [they]
must be under the care of a legally qualified physician or
surgeon and [they] must provide satisfactory evidence of
continuing disability upon the requests of the insurance
company."  Id. at 62.  It is undisputed that during the
relevant time period the plaintiff has remained eligible for
LTD benefits under the Plan's criteria and has continuously
paid the requisite premiums for health and welfare benefits.

than payment of a benefit for Covered Expenses or
losses you incur before the Plan is terminated.
<u>Id.</u> at 117.

The plaintiff received primary health coverage under
the Plan from the onset of his disability until Unilever
notified him by letter on February 17, 2010, that the Plan's
coverage had become secondary to Medicare.  The plaintiff
wrote several letters to Unilever objecting to any attempt
to treat the Plan's coverage as secondary to Medicare.
Counsel for Unilever responded by letter on March 18, 2010,
agreeing with the plaintiff that the Plan provides primary
coverage:

> This serves to notify you that we have determined
> that your client submitted bills totaling
> $4,484.31 to United Healthcare (see attached).
> These claims were pended by United Healthcare as
> UHC was under the assumption that your client was
> on Medicare. In fact, there were multiple letters
> to your client asking for the Medicare EOB. After
> reading your client's responses- I have asked
> United Healthcare today to reprocess the claims as
> if United Healthcare was primary. Accordingly,
> within the next few weeks your client should
> expect to see these bills covered under the terms
> of the Unicare Medical Plan.  Compl. ¶ 15.

The plaintiff followed up with letters requesting that
Unilever provide him with a formal statement on company
letterhead confirming that the coverage provided by the Plan
is primary.  Unilever did not provide such a formal

4

statement.  On April 13, 2010, however, its counsel again
confirmed that the Plan provides primary coverage:

> In response to your letter. . . , we have advised
> United Healthcare that Unilever should be
> considered "primary" while Mr. Pachaly is on Long
> Term Disability and is not enrolled in Medicare
> Part B. We have also advised United Healthcare to
> reprocess Mr. Pachaly's claims that were in pended
> status with Unilever as primary.  Id. at ¶ 17.

After receiving this letter, the plaintiff sought written
confirmation that the Plan would remain primary even if he
were enrolled in Medicare.  Unilever did not respond.

In October 2010, Unilever decided to discontinue the
provision of health and welfare benefits to any individual
who remained on LTD for more than thirty months following
initial receipt of benefits.  Unilever issued the plaintiff
an enrollment package informing him that his benefits would
terminate beginning in 2011, and urging him to enroll in
Medicare.  On January 10, 2011, Unilever sent the plaintiff
a letter confirming that it was terminating his health
insurance coverage under the Plan:

> In order to align the UNICare Benefits of Choice
> Program with federal law, Unilever will
> discontinue all health and welfare benefit
> coverage for participants on LTD following 30
> months of receiving the benefit. You have been
> receiving health and welfare benefit coverage for
> at least 30 months and coverage will end as of
> January 31, 2011. Due to this change, it is

> important for you to immediately enroll in
> Medicare Part B, if you have not already done so,
> to ensure you have medical coverage on and after
> February 1, 2011.  Depending on your health needs,
> you may also want to consider enrolling into a
> Medicare Part D Prescription Drug Plan.  Id. at ¶
> 21.

After receiving this letter, the plaintiff brought this suit seeking injunctive relief preventing Unilever from discontinuing his Plan benefits.  Unilever agreed to maintain the status quo with regard to the plaintiff's benefits pending a determination of whether the complaint states a claim on which relief can be granted.  As a result, the plaintiff's medical bills have continued to be covered under the Plan.

## II. Discussion

In deciding a Rule 12(b)(6) motion to dismiss, well-pleaded facts must be accepted as true and considered in the light most favorable to the plaintiff.  Patane v. Clark, 508 F.3d 106, 111 (2d Cir. 2007).  To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In considering a motion to dismiss, courts may

6

consider "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." <u>DiFolco v. MSNBC Cable L.L.C.</u>, 622 F.3d 104, 111 (2d Cir. 2010).

*The MSP Claim*

Medicare provides health insurance benefits to people over sixty-five with disabilities or end stage renal disease.  42 U.S.C. § 1395c.  Before Congress passed the MSP, Medicare served as the primary payer for all medical treatment within its scope.  <u>Mason v. Am. Tobacco Co.</u>, 212 F. Supp. 2d 88, 91 (E.D.N.Y. 2002) <u>aff'd,</u> 346 F.3d 36 (2d Cir. 2003).  The MSP was enacted to reduce federal spending by making Medicare's payment obligations secondary to those of any entity contractually obliged to pay for an individuals's primary health care.  <u>Id.</u>  Thus, the MSP "makes Medicare a 'secondary' payer where another entity, a 'primary payer,' is required to pay under a 'primary plan' for an individual's healthcare." <u>Mason</u>, 346 F.3d at 38 (internal quotations omitted).  A 'primary plan' is defined by the MSP as "a group health plan or large group plan."  42 U.S.C. § 1395y.

The MSP provides that the administrators of a primary

7

plan "may not take into account that an individual (or the individual's spouse) who is covered under the plan by virtue of the individual's current employment status with an employer is entitled to [Medicare] benefits."  42 U.S.C. § 1395y(b)(1)(A)(I).  In the event primary insurers refuse to pay medical expenses because their insureds also are eligible for Medicare, the MSP provides for an enforcement mechanism through which the United States can recover Medicare payments from the noncompliant primary insurers. Mason, 346 F.3d at 38.  The statute provides:

> In order to recover payment made under this subchapter for an item or service, the United States may bring an action against any or all entities that are or were required or responsible (directly, as an insurer or self-insurer, as a third-party administrator, as an employer that sponsors or contributes to a group health plan, or large group health plan, or otherwise) to make payment with respect to the same item or service (or any portion thereof) under a primary plan. 42 U.S.C. § 1395y(b)(2)(B)(iii).

The MSP also authorizes a "private cause of action for damages."  42 U.S.C. § 1395y(b)(3)(A).  Under this private enforcement mechanism, "individuals whose medical bills are improperly denied by insurers and instead paid by Medicare," can seek double damages on the government's behalf, "and the government is subrogated to the right of the private citizen

8

for the recovery of such funds." <u>Woods v. Empire Health Choice, Inc.</u>, 574 F.3d 92, 101 (2d Cir. 2009).  In other words, "a primary plan is liable under the private cause of action when it discriminates against planholders on the basis of their Medicare eligibility and therefore causes Medicare to step in and (temporarily) foot the bill." <u>Bio-Med. Applications of Tennessee, Inc. v. Cent. States Se. & Sw. Areas Health & Welfare Fund</u>, 656 F.3d 277, 286 (6th Cir. 2011) <u>cert. dismissed,</u> 132 S. Ct. 1087 (U.S. 2012). Congress enabled private parties to recover double damages "to motivate them to bring lawsuits that, in the end, vindicate Medicare's interests." <u>Id.</u>[3]  The threshold issue that must be decided here is whether the plaintiff's claim for injunctive relief is also authorized by the statute.

Under the plain language of the statute, § 1395y(b)(3)(A), the only private cause of action it authorizes is an action for damages.  As other courts have

---

[3] Though enacted with the objective of incentivizing private parties to sue to vindicate harm to the government, MSP's private cause of action is not a <u>qui tam</u> provision (a provision that grants standing to an otherwise-uninjured plaintiff to bring a claim on behalf of the government) and requires that the private party suffer its own harm, as would occur if a primary plan failed to make a required payment to or on behalf of that party. <u>Bio-Med.</u>, 656 F.3d at 297 n.17 (citing <u>Woods</u>, 574 F.3d at 100).

observed, the legislative history and purpose of the MSP
support a determination that such damages do not accrue
until Medicare pays for benefits that the primary insurer
has improperly failed to pay.  See Mason, 346 F.3d at 36;
Bio-Med, 656 F.3d at 286-87.  Here, the plaintiff is not
attempting to collect damages for medical bills improperly
paid by Medicare on his behalf, but instead seeks an
injunction requiring Unilever to pay for future medical
expenses.  No court has allowed a claim for injunctive
relief under § 1395y(b)(3)(A) and I am persuaded that such a
claim is not authorized by the statute.[4]

   *The ERISA Claim*

   ERISA § 502(a)(3), codified at 29 U.S.C. § 1132(a)(3),
provides that an action may be brought "by a participant,
beneficiary, or fiduciary [of an employee welfare benefit
plan] (A) to enjoin any act or practice which violates any
provision of this subchapter or the plan terms, or (B) to
obtain other appropriate equitable relief (i) to redress
such violations or (ii) to enforce any provisions of this
subchapter or the terms of the plan."  29 U.S.C. §

---

   [4]   The government may be authorized to seek
declaratory and injunctive relief under §
1395y(b)(2)(B)(iii).  See United States v. Baxter Int'l,
Inc., 345 F.3d 866, 909 (11th Cir. 2003).

10

1132(a)(3).  If benefits are contractually vested in an
employee welfare plan, they are protected under ERISA.
Schonholz v. Long Island Jewish Med. Ctr., 87 F.3d 72, 77
(2d Cir. 1996).  The plaintiff sues under § 502(a)(3)
claiming that he is entitled to vested welfare benefits
under the doctrine of promissory estoppel.[5]

Promissory estoppel in ERISA cases requires the
following: (1) a promise; (2) reliance on the promise; (3)
injury caused by the reliance; (4) an injustice if the
promise is not enforced; and (5) extraordinary
circumstances.  Aramony v. United Way Replacement Benefit
Plan, 191 F.3d 140, 151 (2d Cir. 1999).  The defendants
contend that the plaintiff has failed to allege the
existence of a promise as required by the first element.
The plaintiff contends that this element is satisfied in
light of the terms of the Plan and representations Unilever
and its agents made in letters to him explaining his
benefits.[6]  The defendants argue that neither the terms of

_____

[5]  The plaintiff previously claimed that his benefits
have contractually vested but that claim has been withdrawn.

[6]For example, the plaintiff relies on a March 24, 1997
letter from Elizabeth Arden's benefits manager stating that
"if Plaintiff is approved for LTD, his UNICare benefits will
continue for the duration of his LTD period, provided [the
plaintiff] makes the required contributions."  See Pl.'s

11

the Plan nor the letters provides the basis for a claim of
promissory estoppel.  I agree.

With regard to the terms of the Plan, the plaintiff
relies on the following language: "other benefits in which
you have enrolled (such as medical, dental, life, AD&D) . .
. may continue during your disability period, provided you
make the required contributions."  Complaint, Ex. A (Doc. 1-
1) at 69.  The Plan goes on to state, however, that "LTD
Plan coverage ends on the date . . . the Plan terminates."
Id.[7]  As mentioned earlier, the Plan also contains
reservation of rights clauses permitting Unilever to change
or terminate the Plan for any reason at any time.  Id. at 5,
117.  Viewed in light of these unambiguous provisions, the
language in the Plan stating that the plaintiff would
receive benefits so long as he paid his premiums cannot
support the plaintiff's claim.  See Robinson v. Sheet Metal

Mem. In Opp'n To Mot. To Dismiss (Doc. 38) at 22-23 and
attached Ex. A.

[7] Under ERISA, an employer typically has a right to
terminate or unilaterally amend a welfare benefit plan at
any time.  See Schonholz, 87 F.3d at 77.  The reverse
presumption applies to disability benefits, however, which
automatically vest no later than the time the employee
becomes disabled unless the plan includes explicit language
to the contrary.  Gibbs v. CIGNA Corp., 440 F.3d 571, 576
(2d Cir. 2006).

Workers' Nat. Pension Fund, Plan A, 441 F. Supp. 2d 405, 432
(D. Conn. 2006) aff'd in part, appeal dismissed in part, 515
F.3d 93 (2d Cir. 2008) ("Plan provisions indicating that
payments would be made 'for life' . . . when read in
conjunction with other provisions expressly reserving the
[administrator's] right to amend the Plan, did not
constitute a contractual promise. . . . *A fortiori*, then,
these same provisions cannot satisfy the first element of
Plaintiff's promissory estoppel claim.").

Turning to the letters, such informal communications do
not alter Unilever's obligations under the terms of the Plan
in the absence of a showing of fraud.  Moore v. Metro. Life
Ins. Co., 856 F.2d 488, 492 (2d Cir. 1988).  "Were all
communications between an employer and plan beneficiaries to
be considered along with the SPDs as establishing the terms
of a welfare plan, the plan documents and the SPDs would
establish merely a floor for an employer's future
obligations" eliminating "predictability as to the extent of
future obligations" and creating "substantial disincentives
for even offering such plans."  Id.  The complaint does not
allege facts supporting a plausible claim of fraud based on
the letters.  Thus, they do not provide the basis for a

13

promissory estoppel claim.

The complaint also fails to plead facts showing the existence of "extraordinary circumstances."  This element typically is found when plan administrators made a promise about benefits to induce the insured to act.  See Robinson, 441 F. Supp. 2d at 432 (citing Schonholz, 87 F.3d at 79).  The requirement that a plaintiff prove extraordinary circumstances serves to "lessen the danger that commonplace communications from employer to employee will routinely be claimed to give rise to employee's rights beyond those contained in formal benefit plans." Id.  There is no allegation that Unilever made a promise to the plaintiff concerning his benefits to induce any action on his part.  Accordingly, the plaintiff has failed to state a cognizable claim under ERISA.[8]

---

[8]The complaint can be read to allege a breach of fiduciary duty claim under ERISA as the plaintiff claims that Unilever acted under a conflict of interest and placed its pecuniary interest before the interests of the plaintiff in terminating his benefits.  ERISA creates certain fiduciary duties on the part of plan trustees and administrators. Wilkins v. Mason Tenders Dist. Council Pension Fund, 445 F.3d 572, 579 (2d Cir. 2006) (citing ERISA § 404(a)(1)(B)).  In the context of amending the terms of a welfare plan, however, plan administrators do not fall into the category of fiduciaries. Lockheed Corp. V. Spink, 517 U.S. 882, 890 (1996).  Rather, an employer's decision to amend or terminate an ERISA plan is a settlor function, analogous to establishing a trust, and is "immune from

III. <u>Conclusion</u>

Accordingly, the defendant's motion to dismiss (Doc. 33) is hereby granted.

So ordered this 16th day of January 2013.

_____/s/RNC_____
Robert N. Chatigny
United States Disrict Judge

---

ERISA's fiduciary obligations."  <u>Beck v. PACE Int'l Union</u>, 551 U.S. 96, 101 (2007).